# United States Tax Court

167 T.C. No. 3

JAMES WENDELIN EILER AND KATHRYN ANN EILER,
DECEASED,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 16903-22.                               Filed July 14, 2026.

_____

Ps sued multiple credit reporting agencies pursuant to certain provisions of the Fair Credit Reporting Act (FCRA), Pub. L. No. 91-508, tit. VI, 84 Stat. 1114, 1127 (1970). In pursuit of these claims, Ps entered into legal service agreements with a law firm, which dictated how the various recovery types would be allocated between Ps and the firm.

Ps eventually settled with each credit reporting agency, and they all issued Forms 1099–MISC, Miscellaneous Income, to Ps reporting the full settlement amounts. Ps reported only the income reflected on Form 1099–MISC issued by the law firm, which was equal to the full settlement amounts less attorney's fees and costs. R issued a Notice of Deficiency determining a deficiency for 2019 based on Ps' failure to include the full settlement amounts in gross income. Ps argue that the attorney's fees and costs portion of the settlement proceeds is excludible from gross income under the FCRA's fee-shifting provisions. They argue in the alternative that those proceeds are deductible from gross income under I.R.C. § 62(a)(20).

*Held*: The full settlement proceeds amounts are includible in Ps' gross income.

*Held, further*, Because Ps settled their FCRA actions, the statute's fee-shifting provisions are inapplicable.

*Held, further*, Ps' FCRA actions did not involve claims of unlawful discrimination as defined in I.R.C. § 62(e)(18)(i).

––––––––––

*Ashley R. Schieck* and *Robert D. Probasco*, for petitioners.

*Derek S. Pratt* and *Sergey G. Garanyants*, for respondent.

OPINION

GUIDER, *Judge*: The Internal Revenue Service (IRS or respondent) determined a deficiency of $11,423 in petitioners' income tax for 2019. At issue is whether the portion of certain litigation settlement proceeds consisting of attorney's fees and costs is includible in the gross income of James Wendelin Eiler and Kathryn Ann Eiler.[1] The Eilers contend that two fee shifting provisions of the Fair Credit Reporting Act (FCRA), Pub. L. No. 91-508, tit. VI, 84 Stat. 1114, 1127 (1970), apply and operate to exclude the settlement portion at issue from their gross income. *See* 15 U.S.C. §§ 1681n(a)(3), 1681o(a)(2). They argue in the alternative that if the attorney's fees and costs are includible in their gross income, they are deductible pursuant to section 62(a)(20).[2] That is so, they claim, because their actions under the FCRA involved claims of "unlawful discrimination" as defined in section 62(e)(18)(i), and certain provisions of the FCRA provide for the enforcement of "civil rights." This argument presents an issue of first impression for the

––––––––––

[1] By Status Report filed September 17, 2025, petitioners indicated that petitioner Kathryn Ann Eiler had passed away on July 16, 2025.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are shown in U.S. dollars and rounded to the nearest dollar.

Court. Respondent disagrees with this argument. We agree with respondent.

*Background*

The parties submitted this case fully stipulated under Rule 122. The facts below are based on the pleadings and the parties' Stipulation of Facts (including the Exhibits attached thereto). The parties' Stipulation of Facts with the accompanying Exhibits is incorporated herein by this reference. The Eilers resided in the State of Nevada when they timely filed their Petition.[3]

In November 2017 the Eilers entered into separate but substantially similar legal service agreements (service agreements) with Hailes & Krieger, LLC (H&K), in pursuit of actions under the FCRA against LexisNexis Risk Solutions, Inc. (LexisNexis), Equifax Information Services, LLC (Equifax), Experian Information Solutions, Inc. (Experian), Trans Union, LLC (Trans Union) (collectively, relevant defendants[4]), and various other consumer reporting agencies. The Eilers believed that these entities had reported inaccurate, incomplete, and/or incorrect and derogatory information on their credit reports. The service agreements indicated that the Eilers' main objective was the removal of improperly reported information from their credit reports but that they might also be entitled to recover statutory damages ranging up to $1,000, actual damages, punitive damages, and attorney's fees. According to the service agreements, the Eilers would receive 100% of any statutory damages "as awarded by Court/jury" and 50% of any actual and punitive damages after subtracting costs and expenses "whether obtained after trial, through settlement, or by any other method." The attorneys would receive 50% of any actual and punitive damages after subtracting costs and expenses and 100% of attorney's fees "determined by Court Order or negotiated to be paid by the Defendant through settlement of the Matter." In the absence of any recovery, the Eilers would pay no legal fees, costs, or expenses. The service agreements provided that the Eilers would pay the attorneys for "legal costs and expenses out of any recovery of actual and/or punitive damages" but also that costs and expenses would be "subtracted from any gross recovery" in the matter. The Eilers acknowledged that "any

---

[3] Absent stipulation to the contrary, this case is thus appealable to the U.S. Court of Appeals for the Ninth Circuit. *See* I.R.C. § 7482(b)(1)(A), (2).

[4] Only the settlement agreements with Equifax, Experian, LexisNexis, and Trans Union are at issue.

payment by the Defendant in settlement to Client for actual/punitive damages (as opposed to statutory damages) would be expressly stated as such in the written settlement agreement." The Eilers further acknowledged that "other fee arrangements are available (*i.e.*, hourly and flat fee arrangements), but that the parties determined that a contingency fee on the terms described herein is appropriate." The service agreements acknowledged that the Eilers understood that the attorneys might recover tens of thousands of dollars, if not more, in fees and costs even if the Eilers did not obtain any financial recovery, and that even in that situation the Eilers might face increased tax liability.

On September 10, 2018, James Eiler filed suit against the relevant defendants and other consumer reporting agencies for damages pursuant to the FCRA in the U.S. District Court for the District of Nevada. On September 20, 2018, Kathryn Eiler filed a similar suit in the same court against the same defendants plus Chase Bank USA, N.A., d.b.a. Chase Card. From November 2018 to February 2019 the Eilers filed notices of settlement and executed actual settlement agreements with the relevant defendants in the first half of 2019. Each of the settlement agreements was for a lump sum; none of them separated the lump sum into the categories included in the service agreements.

Under the settlement agreements, the relevant defendants first issued payments to petitioners' counsel (either to an H&K trust account or to Kazerouni Law Group, APC (Kazerouni)), after which the funds were allocated among the Eilers and three law firms—H&K, Kazerouni, and Hyde & Swigart, APC—for attorney's fees and costs. The Eilers thereafter signed disbursement summaries with their attorneys approving the settlement fund allocations. The relevant defendants paid out a total of $64,750, of which $4,700 was ultimately distributed to the Eilers. The remaining $60,050 went to the three law firms. The Eilers received Forms 1099–MISC from the relevant defendants showing other income totaling $64,750. The Eilers also received Forms 1099–MISC from H&K showing other income totaling $4,900.[5] They reported only the latter amount on their 2019 tax return.

---

[5] The record does not show why there was a disparity between the $4,700 the Eilers received and the $4,900 reported on the Form 1099–MISC that the Eilers received from H&K. However, because we hold that the full amount of the settlement proceeds is includible in petitioners' gross income, we need not address the disparity.

On April 25, 2022, the IRS issued a Notice of Deficiency to the Eilers for tax year 2019, and on July 18, 2022, the Eilers timely filed their Petition in this Court.

*Discussion*

I.    *Burden of Proof*

The Commissioner's determinations in a Notice of Deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). In cases involving unreported income, the Commissioner must first establish an evidentiary foundation connecting the taxpayer with the income-producing activity, *see Portillo v. Commissioner*, 932 F.2d 1128, 1133 (5th Cir. 1991), *aff'g in part, rev'g in part and remanding* T.C. Memo. 1990-68, or demonstrate that the taxpayer actually received income, *Edwards v. Commissioner*, 680 F.2d 1268, 1270–71 (9th Cir. 1982) (per curiam). Information supplied to the IRS by other payors on Forms 1099 is sufficient to meet this burden. *See Hardy v. Commissioner*, 181 F.3d 1002, 1004–05 (9th Cir. 1999), *aff'g* T.C. Memo. 1997-97. "Once the Commissioner makes the required threshold showing, the burden shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous." *Walquist v. Commissioner*, 152 T.C. 61, 67–68 (2019) (citing *Helvering v. Taylor*, 293 U.S. 507, 515 (1935)); *see Texasgulf, Inc., & Subs. v. Commissioner*, 172 F.3d 209, 214 (2d Cir. 1999), *aff'g* 107 T.C. 51 (1996).

Here, respondent has provided copies of the Forms 1099 sent to petitioners from the relevant defendants for tax year 2019. Petitioners have not disputed the accuracy or authenticity of these documents. Consequently, respondent has met his burden of production with respect to the unreported income such that the burden of proof shifts to petitioners.

The fact that a case has been submitted under Rule 122 "does not alter the burden of proof, or the requirements otherwise applicable with respect to adducing proof, or the effect of failure of proof." Rule 122(b). Section 7491(a) provides that, if the taxpayer "introduces credible evidence with respect to any [relevant] factual issue," the burden of proof shall shift to the Commissioner "with respect to such issue." Petitioners do not contend nor does the evidence establish that section 7491(a) applies to shift the burden of proof.

II.    *Gross Income*

A.    *General Principles*

Gross income includes all income from whatever source derived, unless otherwise specifically excluded. I.R.C. § 61(a). And "exclusions from income must be narrowly construed." *Commissioner v. Schleier*, 515 U.S. 323, 328 (1995) (quoting *United States v. Burke*, 504 U.S. 229, 248 (1992) (Souter, J., concurring)). Section 62 defines adjusted gross income, in the case of an individual, as gross income minus certain deductions. Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Deductions are also construed narrowly. *LaFlamme v. Commissioner*, T.C. Memo. 2012-36, 2012 WL 371897, at *3 (first citing *Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 148–49 (1974); then citing *Deputy v. du Pont*, 308 U.S. 488, 493 (1940); and then quoting *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934) ("[O]nly as there is clear provision therefor can any particular deduction be allowed.")). "Further, the rule that ambiguities in statutes imposing taxes are to be resolved in favor of the taxpayer does not apply in determining what the taxpayer may deduct." *Bagnall v. Commissioner*, 96 F.2d 956, 957 (9th Cir. 1938) (first citing *New Colonial Ice Co. v. Helvering*, 292 U.S. 435; and then citing *Helvering v. Inter-Mountain Life Insurance Co.*, 294 U.S. 686, 689 (1935)), *aff'g* 35 B.T.A. 1 (1936).

B.    *Settlement Proceeds*

"The taxability of the proceeds of a lawsuit, or of a sum received in settlement thereof, depends upon the nature of the claim and the actual basis of recovery." *Sager Glove Corp. v. Commissioner*, 36 T.C. 1173, 1180 (1961), *aff'd*, 311 F.2d 210 (7th Cir. 1962). The parties do not dispute the taxability of the amounts shown on Forms 1099–MISC from H&K. Rather, the only dispute is whether the remaining $59,850 shown on Forms 1099–MISC from the relevant defendants is taxable to petitioners.

Respondent contends that the settlement proceeds petitioners received were to replace economic losses from the relevant defendants' inaccurate credit reporting. Although petitioners object to this characterization, the settlement agreements were silent as to any allocation to types of damages. A taxpayer's "[f]ailure to show the specific amount of the payment allocable to the [excludible] claims * * *

results in the entire amount's being presumed not to be excludible." *Holliday v. Commissioner*, T.C. Memo. 2021-69, at *13 n.6 (quoting *Pipitone v. United States*, 180 F.3d 859, 864 (7th Cir. 1999)). "Where the agreement is silent as to the basis of the settlement or where the agreement does not specify that the payment was for a reason that a court finds to be nontaxable, this Court has held the settlement payment to be taxable." *Id.* (quoting *Lawson v. Commissioner*, T.C. Memo. 2015-211, at *28–29).

C.    *Attorney's Fees and Costs*

"[A]s a general rule, when a litigant's recovery constitutes income, the litigant's income includes the portion of the recovery paid to the attorney as a contingent fee." *Commissioner v. Banks*, 543 U.S. 426, 430 (2005). The Supreme Court reached this holding by applying the anticipatory assignment of income doctrine—a taxpayer "cannot exclude an economic gain from gross income by assigning the gain in advance to another party." *Id.* at 433. The Court agreed that "a contingent-fee agreement should be viewed as an anticipatory assignment to the attorney of a portion of the client's income from any litigation recovery." *Id.* at 434.

The Eilers argue that the contingent fees were contingent in the limited sense that the attorneys would receive nothing if the Eilers recovered nothing, not in the sense that the attorneys would receive a fixed percentage of the total recovery. Indeed, the service agreements were silent as to how the attorney's fees would be calculated. The Eilers contend that the fee structure was therefore not a typical contingent fee arrangement and that the attorney's fees portion of their recovery should be considered fees paid under a fee shifting provision.

But the mere fact that the arrangement was not a typical one does not mean there was no contingent fee arrangement. A contingent fee is a "fee charged for a lawyer's services only if the lawsuit is successful or is favorably settled out of court." *Contingent Fee, Black's Law Dictionary* (12th ed. 2024). "Contingent fees are *usu*[*ally*] calculated as a percentage of the client's net recovery (such as 25% of the recovery if the case is settled, and 33% if the case is won at trial)." *Id.* (emphasis added). The Eilers' fee arrangement is consistent with only the first part of the foregoing definition, making it an atypical contingent fee arrangement perhaps, but a contingent fee arrangement nonetheless.

Instead of being paid under a contingent fee arrangement, the Eilers argue that the fees incurred were negotiated pursuant to the fee-shifting provisions of the FCRA.

> Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable *to that consumer* in an amount equal to . . . *in the case of any successful action* to enforce any liability under this section, the costs of the action together with reasonable attorney's fees *as determined by the court.*

15 U.S.C. § 1681n(a) (emphasis added).

> Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable *to that consumer* in an amount equal to the sum of . . . *in the case of any successful action* to enforce any liability under this section, the costs of the action together with reasonable attorney's fees *as determined by the court.*

15 U.S.C. § 1681o(a) (emphasis added). The Eilers did not mount successful FCRA actions; they settled their cases, and the relevant defendants specifically disclaimed any fault or liability in the settlement agreements. Finally, neither the costs of the actions nor the attorney's fees were "determined by the court." The fee-shifting statutes are simply inapplicable.

Even if the fee-shifting statutes applied in this case, the Ninth Circuit has held that a defendant's payment of a plaintiff's attorney's fees and costs pursuant to a fee-shifting statute constitutes income to the taxpayer. *Sinyard v. Commissioner*, 268 F.3d 756, 759–60 (9th Cir. 2001), *aff'g* T.C. Memo. 1998-364. The Eilers could not escape the *Banks* holding, "whether the attorney's fee was paid on a contingent fee basis or pursuant to a fee-shifting statute." *Sanford v. Commissioner*, T.C. Memo. 2008-158, 2008 WL 2491676, at *4 (first citing *Sinyard v. Commissioner*, 268 F.3d 756; then citing *Green v. Commissioner*, T.C. Memo. 2007-39, *aff'd in part, rev'd in part*, 312 F. App'x 929 (9th Cir. 2009); and then citing *Vincent*, T.C. Memo. 2005-95). "A third party's discharge of a taxpayer's obligation is income to the taxpayer." *Id.*, 2008 WL 2491676, at *4 (citing *Old Colony Tr. Co. v. Commissioner*, 279 U.S. 716, 729 (1929)). That the relevant defendants paid the Eilers' attorneys

directly would not change the result. *See id.* (citing *Sinyard v. Commissioner*, 268 F.3d at 759).

The Eilers bemoan a "perverse result" like the one in *Commissioner v. Banks*, 543 U.S. at 438, arising from a decision adverse to them, but as the Ninth Circuit observed in *Sinyard*, we "do not think we can change the basic rules of income tax in order to correct this result." *Sinyard v. Commissioner*, 268 F.3d at 759 (citing *Benci-Woodward v. Commissioner*, 219 F.3d 941, 944 (9th Cir. 2000), *aff'g* T.C. Memo. 1998-395).

III.    *Adjusted Gross Income*

Among the permitted deductions from gross income is "[a]ny deduction allowable under [title 26, subtitle A, chapter 1] for attorney fees and court costs paid by, or on behalf of, the taxpayer in connection with any action involving a claim of unlawful discrimination (as defined in subsection (e))." I.R.C. § 62(a)(20).[6] "For purposes of subsection (a)(20), the term 'unlawful discrimination' means an act that is unlawful under . . . [a]ny provision of Federal, State, or local law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights." I.R.C. § 62(e)(18)(i). Petitioners contend that their FCRA claims qualify and that they are entitled to a deduction under section 62(a)(20).[7]

A.    *Fair Credit Reporting Act*

In passing the FCRA, Congress made relevant findings and stated the FCRA's purpose. "The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." FCRA § 601, 84 Stat. at 1128. "There is a need to insure that consumer reporting agencies

---

[6] When a statute includes an explicit definition, we follow that definition, even if it differs from the term's ordinary meaning. *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018).

[7] Respondent has conceded that the fees in question are deductible under section 212. Without necessarily agreeing with that concession, because respondent has conceded the point, we will not explore the issue further. *See, e.g.*, *Madison Gas & Elec. Co. v. Commissioner*, 72 T.C. 521, 557–58 (1979), *aff'd*, 633 F.2d 512 (7th Cir. 1980).

exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." *Id.* Congress stated that

> [i]t is the purpose of [the FCRA] to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of [the FCRA].

*Id.*

B.    *Civil Rights*

Congress did not define "civil rights" in the context of section 62. *See* American Jobs Creation Act of 2004 (AJCA), Pub. L. No. 108-357, § 703, 118 Stat. 1418, 1546. When a statute does not define a term, "we ask what that term's 'ordinary, contemporary, common meaning' was when Congress enacted [the relevant provision]." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433–34 (2019) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)); *accord Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 234 (2018) (reviewed). It is well established that a court may consult dictionaries to determine that ordinary meaning. *See Muscarello v. United States*, 524 U.S. 125, 127–32 (1998); *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010); *Gates v. Commissioner*, 135 T.C. 1, 6 (2010).

Contemporaneous dictionaries generally defined "civil right" as the "individual rights of personal liberty guaranteed by the Bill of Rights and by the 13th, 14th, 15th, and 19th Amendments, as well as by legislation such as the Voting Rights Act." *Civil Right*, *Black's Law Dictionary* (8th ed. 2004). "Civil rights include esp[ecially] the right to vote, the right of due process, and the right of equal protection under the law."[8] *Id.* Other contemporaneous dictionaries defined the term in a

---

[8] This contemporaneous definition of civil rights is consistent with the term's usage today as "the individual rights of personal liberty guaranteed by the Bill of Rights and by the 13th, 14th, 15th, and 19th Amendments, as well as by legislation such as the Voting Rights Act." *Civil Right*, *Black's Law Dictionary* (12th ed. 2024); *see also Civil Rights*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/civil%20rights (last updated June 29, 2026) (defining "civil

similar manner. *See, e.g.*, *Civil Rights*, *American Heritage Dictionary* (4th ed. 2000) ("[t]he rights belonging to an individual by virtue of citizenship, especially the fundamental freedoms and privileges guaranteed by the 13th and 14th Amendments to the U.S. Constitution and by subsequent acts of Congress"); *Civil Rights*, *Webster's New Universal Unabridged Dictionary* (2003) ("rights to personal liberty established by the 13th and 14th Amendments and certain Congressional acts, esp. as applied to an individual or minority group"); *Civil Rights*, *Webster's Third New International Dictionary* (2002) ("the rights secured to citizens of the U.S. by the 13th and 14th amendments to the constitution and certain acts passed by Congress").

Petitioners urge us to embrace a broader scope for the term. They point to a recent definition defining a "civil right" as "a privilege accorded to an individual, as well as a right due from one individual to another, the violation of which is a civil injury for which redress may be sought in a civil action." 15 Am. Jur. 2d *Civil Rights* § 1 (2025). "Thus, a civil right is a legally enforceable claim of one person against another. 'Civil rights' have also been defined simply as such rights as the law will enforce, or as all those rights which the law gives a person." *Id.* (footnote omitted). In further support, petitioners point to an earlier definition of a "civil right" which encompasses "[p]ersonal, natural rights guaranteed and protected by the Constitution."[9] *Civil Liberties*, *Black's Law Dictionary* (5th ed. 1979).

In our pursuit to discern the ordinary, *contemporary*, common meaning of civil rights at the time of the AJCA's enactment, we are not convinced that the two definitions petitioners supplied are controlling, especially compared to the definition in the eighth edition of *Black's Law Dictionary*, published the same year in which Congress passed the AJCA. *See Food Mktg. Inst.*, 588 U.S. at 433–34. "A term is ambiguous if it is 'capable of being understood in two or more possible senses or ways.'" *Guardian Indus. Corp. v. Commissioner*, 143 T.C. 1, 13 (2014) (quoting *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001)). "While 'the plain meaning of a statute controls where that meaning is unambiguous,' we must look beyond the text if the text is ambiguous." *United States v. Metcalf*, 156 F.4th 871, 878 (9th Cir. 2025) (quoting

---

rights" as those rights guaranteed by the government "to ensure equal opportunities (as for employment, education, housing, or voting) and equal protection under the law regardless of personal characteristics such as race, religion, or sex").

[9] The fifth edition of *Black's Law Dictionary* defines "Civil Rights" by reference to "Civil Liberties," hence the citation thereto.

*Khatib v. Cnty. of Orange*, 639 F.3d 898, 902 (9th Cir. 2011) (en banc)). If a statute's terms are ambiguous, "we may use canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent." *Woods v. Carey*, 722 F.3d 1177, 1181 (9th Cir. 2013) (quoting *Jonah R. v. Carmona*, 446 F.3d 1000, 1005 (9th Cir. 2006)).

The long title of the AJCA, reflecting its overall purpose, was "[a]n [a]ct [t]o amend the Internal Revenue Code of 1986 to remove impediments in such Code and make our manufacturing, service, and high-technology businesses and workers more competitive and productive both at home and abroad." *See* H.R. 4520, 108th Cong. (2004). AJCA § 703, "Civil rights tax relief," effected changes to section 62 by adding then paragraph (19) (current paragraph (20)) to subsection (a) and adding subsection (e). *See* AJCA § 703, 118 Stat. at 1546. "For those who consider legislative history relevant," *Warger v. Shauers*, 574 U.S. 40, 48 (2014), such history pertinent to our inquiry is scant. Petitioners refer to a colloquy between Senators Max Baucus and Charles Grassley in which the two discussed civil rights tax relief and unlawful discrimination, but the exchange did not provide a definition of "civil rights." *See* 150 Cong. Rec. S11036 (daily ed. Oct. 10, 2004) (statements of Sens. Max Baucus and Charles Grassley). And in any event, "Congress expresses itself as a body through the text it enacts." *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 146 S. Ct. 1546, 1558 (2026).

C.    *Petitioners' Arguments*

1.    *A Broad Definition of "Civil Rights"*

Petitioners argue that a broad interpretation of "civil rights" applies to bring their FCRA claims within the scope of section 62(e)(18)(i). Their primary support for this argument is an IRS general counsel memorandum applying a broad scope to the phrase "human and civil rights" in the context of section 501(c)(3) charitable organizations. I.R.S. G.C.M. 38,468 (Aug. 12, 1980).[10] Therein, the IRS stated that

---

[10] Petitioners support this position with other nonprecedential sources. *See Nat'l Right to Work Legal Def. & Educ. Found., Inc. v. United States*, 487 F. Supp. 801, 806 (E.D.N.C. 1979) (holding that the right to work is a "human and civil right secured by law"); *Colegrove v. Hoopa Timber Corp.* (*In re Colegrove*), 9 B.R. 337, 339 (Bankr. N.D. Cal. 1981) ("[A] civil right is a legally enforceable claim of one person against another."). However, absent stipulation to the contrary, this case is appealable to the Ninth Circuit. *See* I.R.C. § 7482(b)(1)(A), (2). The Court is therefore bound here by only

"[t]he term 'human and civil rights secured by law' should not be construed . . . so as to only include those rights which are clearly guaranteed under the fifth, thirteenth, and fourteenth amendments." *Id.* Instead, the phrase "should be construed quite broadly." *Id.*

These authorities do not persuade us that petitioners' FCRA claims fall within the scope of section 62(e)(18)(i). A general counsel memorandum is merely a legal opinion from one division of the IRS Office of Chief Counsel to another and is not precedential. *Uniband, Inc. v. Commissioner*, 140 T.C. 230, 257 (2013); *Old Harbor Native Corp. v. Commissioner*, 104 T.C. 191, 206–07 (1995). But even if the memorandum were binding authority, it does not support petitioners' conclusion. G.C.M. 38,468 applies a broad scope to "*human and* civil rights" (emphasis added). The combined scope of human rights and civil rights is logically broader than the scope of civil rights alone.

The ordinary meaning of a word is not "the broadest possible meaning that the definition of the word can bear"; it is how the word is "normally" and most "natural[ly]" understood. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569 (2012). We follow "'the most natural [or ordinary] reading' of the term even if there are other 'plausible reading[s] of the statutory text.'" *United States v. Davey*, 151 F.4th 1249, 1255 (10th Cir. 2025) (quoting *Republic of Sudan v. Harrison*, 587 U.S. 1, 8 (2019)); *see also Rajaram v. Meta Platforms, Inc.*, 105 F.4th 1179, 1186 (9th Cir. 2024) ("[W]e interpret the statute before us according to the most natural meaning of its text."). And we "limit otherwise capacious terms when th[e] context 'tug[s] . . . in favor of a narrower reading.'" *Arconic, Inc. v. APC Inv. Co.*, 969 F.3d 945, 953 (9th Cir. 2020) (second alteration in original) (quoting *Mellouli v. Lynch*, 575 U.S. 798, 812 (2015)).

Popular usage of the phrase "civil rights" evokes concepts like equal protection, due process, and voting rights—not fairness and accuracy in credit reporting. The former concepts represent the "ordinary" and "most natural" meanings of the phrase "civil rights," and they are akin to the very rights Congress sought to protect in the consumer credit arena beginning almost exactly four years after passage of the FCRA. In 1974 Congress enacted the Equal Credit Opportunity Act in part to prohibit discrimination on the basis of sex or marital

---

(i) its own precedent, (ii) Ninth Circuit precedent, and (iii) U.S. Supreme Court precedent. *See Golsen v. Commissioner*, 54 T.C. 742, 756–57 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

status in credit transactions. *See* Pub. L. No. 93-495, §§ 502 and 503, 88 Stat. 1500, 1521 (1974). Today, it is "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)." 15 U.S.C. § 1691(a)(1).[11] The FCRA contains no such provision, wording Congress easily could have included and which one would expect if Congress had intended the FCRA to protect civil rights. In fact, the only mention of discrimination within the FCRA relates to its affiliate marketing rules, which do not apply if compliance with the rules "would prevent compliance by that person with any provision of State insurance laws pertaining to unfair discrimination," 15 U.S.C. § 1681s-3(a)(4)(F), and which in any event were not at issue in any of the Eilers' original actions.

Finally, we normally construe Congress's work "so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant." *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). A sweeping definition of "civil rights" in this context would seemingly render section 62(e)(18)(ii) superfluous as provisions of federal law "providing for the enforcement of civil rights," I.R.C. § 62(e)(18)(i), would subsume provisions of federal law "regulating any aspect of the employment relationship, including claims for wages, compensation, or benefits, or prohibiting the discharge of an employee, the discrimination against an employee, or any other form of retaliation or reprisal against an employee for asserting rights or taking other actions permitted by law," I.R.C. § 62(e)(18)(ii). The "context 'tug[s] . . . in favor of a narrower reading.'" *Arconic, Inc.*, 969 F.3d at 953 (alterations in original) (quoting *Mellouli*, 575 U.S. at 812).

### 2. *Narrow Definition of "Civil Rights"; Privacy*

In addition, petitioners argue that violations of the FCRA's protection of consumer privacy implicate a constitutional right to informational privacy, an argument that correlates more with the narrower definition of "civil rights" involving the Fourteenth

---

[11] A "[*c*]*redit transaction*" means "every aspect of an applicant's dealings with a creditor regarding an application for credit or an existing extension of credit (including, but not limited to, information requirements; investigation procedures; standards of creditworthiness; terms of credit; furnishing of credit information; revocation, alteration, or termination of credit; and collection procedures)." 12 C.F.R. § 1002.2(m) (2026).

Amendment. Congress found that there is "a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the *consumer's right to privacy*." 15 U.S.C. § 1681(a)(4) (emphasis added). "Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and *protect consumer privacy*." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) (emphasis added). The Supreme Court has "referred broadly to a constitutional privacy 'interest in avoiding disclosure of personal matters.'" *NASA v. Nelson*, 562 U.S. 134, 138 (2011) (first quoting *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977); and then quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457 (1977)). But the Court in *Nelson*, 562 U.S. at 138, only "assume[d], without deciding, that the Constitution protects a privacy right of the sort mentioned in *Whalen* and *Nixon*."[12] The Ninth Circuit has, however, "recognized a right to informational privacy under the Fourteenth Amendment stemming from an individual's interest in avoiding disclosure of personal matters." *Doe v. Bonta*, 101 F.4th 633, 637 (9th Cir. 2024) (citing *Endy v. Cnty. of Los Angeles*, 975 F.3d 757, 768 (9th Cir. 2020)).[13]

Petitioners suggest that the FCRA's consumer privacy protections fall under that right to informational privacy and that therefore their actions were claims of unlawful discrimination of the kind contemplated by section 62(e)(18)(i). But recall the text of section 62(e)(18), which does not say "[a]ny . . . Federal . . . law" but rather "[a]ny *provision of* Federal . . . law." (Emphasis added.) A "provision" is a "clause in a statute, contract, or other legal instrument." *Provision*, *Black's Law Dictionary* (8th ed. 2004). It is also defined as a "particular requirement in a law,

---

[12] *But see Nelson*, 562 U.S. at 169 (Thomas, J., concurring) ("I agree with Justice SCALIA that the Constitution does not protect a right to informational privacy."); *Am. Fed'n of Gov't Emps., AFL-CIO v. Dep't of Hous. & Urb. Dev.*, 118 F.3d 786, 791 (D.C. Cir. 1997) ("We begin our analysis by expressing our grave doubts as to the existence of a constitutional right of privacy in the nondisclosure of personal information.").

[13] The right does not extend to all information. While it conditionally includes, for example, medical information, *see Seaton v. Mayberg*, 610 F.3d 530, 537–38 (9th Cir. 2010), and might include the indiscriminate public disclosure of Social Security numbers along with names and addresses, *see Ferm v. U.S. Tr. (In re Crawford)*, 194 F.3d 954, 958 (9th Cir. 1999), it might not include biographical data, *see Bonta*, 101 F.4th at 637 (citing *A.C. ex rel. Park v. Cortez*, 34 F.4th 783, 787–88 (9th Cir. 2022)), or name, age, and employment history, *see id.* (citing *Doe v. Garland*, 17 F.4th 941, 944, 947 (9th Cir. 2021)). Ultimately, the right recognized encompasses only "highly sensitive" and "intimate personal information." *Id.* at 637–38.

rule, agreement, or document." *Provision*, *American Heritage Dictionary of the English Language* (5th ed. 2022), https://www.ahdictionary.com/word/search.html?q=provision (last visited June 30, 2026). We are concerned in this case not with the entirety of the FCRA but rather with the provisions of the FCRA at issue in the "claim[s]" in the Eilers' original "action[s]." *See* I.R.C. § 62(a)(20). The Eilers made claims alleging violations of 15 U.S.C. §§ 1681e(b) ("Accuracy of report"), 1681g ("Disclosures to consumers"), 1681i(a) ("Reinvestigations of disputed information"), and 1681s-2(b) ("Duties of furnishers of information upon notice of dispute").

Title 15 U.S.C. § 1681e(b) requires "consumer reporting agenc[ies] . . . [to] follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." "[T]o make out a prima facie violation under [15 U.S.C.] § 1681e(b), a consumer must present evidence tending to show that a credit reporting agency prepared a report containing inaccurate information." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995). Similarly, 15 U.S.C. § 1681g requires that "[e]very consumer reporting agency shall, upon request, . . . clearly and accurately disclose to the consumer: . . . [a]ll information in the consumer's file at the time of the request." 15 U.S.C. § 1681g(a). This section's "disclosure and summary-of-rights requirements are designed to protect consumers' interests in learning of any inaccuracies in their credit files so that they can promptly correct the files before they are disseminated to third parties." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2213 (2021). Likewise, "if the completeness or accuracy of any item of information contained in a consumer's file . . . is disputed by the consumer and the consumer notifies the [consumer reporting] agency directly, . . . the agency shall . . . conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." 15 U.S.C. § 1681i(a)(1)(A); *see also Shaw v. Experian Info. Sols., Inc.*, 891 F.3d 749, 756 (9th Cir. 2018) (holding that a consumer's claim under 15 U.S.C. § 1681i was without merit for failing to "make a 'prima facie showing of inaccurate reporting'" by the consumer reporting agency (quoting *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890 (9th Cir. 2012))).

The Eilers made no claims alleging violations of, e.g., 15 U.S.C. § 1681b ("Permissible purposes of consumer reports"), 1681q ("Obtaining information under false pretenses"), or 1681r ("Unauthorized disclosures by officers or employees"). Unlike the provisions on which the Eilers' actions were based, these provisions have

been found by other courts to relate to privacy. "Congress passed [15 U.S.C.] Section 1681b[] in order to protect consumers from 'improper invasion[s] of privacy,' S. Rep. No. 104-185 at 35 (1995), and [this section's] disclosure and authorization requirements fit hand in glove to achieve that purpose," *Syed v. M-I, LLC*, 853 F.3d 492, 501 (9th Cir. 2017). "Congress' concern for privacy in one's consumer report is made clear by the FCRA's . . . provision of criminal (and civil) liability for those obtaining a credit report under false pretenses, 15 U.S.C. § 1681q," *Nayab v. Cap. One Bank (USA), NA*, 942 F.3d 480, 492 (9th Cir. 2019) (footnote omitted), as well as for "officer[s] or employee[s] of a consumer reporting agency . . . [who] knowingly and willingly provide[] [such] information . . . to a person not authorized to receive that information," 15 U.S.C. § 1681r; *Trans Union Corp. v. FTC*, 245 F.3d 809, 818 (D.C. Cir. 2001). A consumer "has standing to vindicate her right to privacy under the FCRA when a third-party obtains her credit report without a purpose authorized by the statute, regardless whether the credit report is published or otherwise used by that third-party." *Nayab*, 942 F.3d at 493.

Even using a "civil rights" definition that includes a right to informational privacy, considering the various purposes of the FCRA we find the Eilers' claims were based on provisions related to "fair and accurate credit reporting," not "consumer privacy." *See Safeco Ins. Co. of Am.*, 551 U.S. at 52. Assuming arguendo the Eilers' claims did involve informational privacy, it is not at all clear to us that they involved "highly sensitive" and "intimate personal information." *See Bonta*, 101 F.4th at 637–38. Because the Eilers have not argued that their information falls into those two categories, we decline to analyze the issue further. *See Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) ("If an argument is not pursued on brief, we may conclude that it has been abandoned."); *Petzoldt v. Commissioner*, 92 T.C. 661, 683 (1989) ("Since [the taxpayer] failed to argue this point on brief, we treat this as, in effect, a concession by [the taxpayer].").

IV.   *Conclusion*

The FCRA's fee-shifting provisions are inapplicable in this case, and the attorney's fees and costs are includible in the Eilers' gross income. Further, in the context of section 62, we decline to construe the term "civil rights" so broadly as to include petitioners' title 15 claims concerning fairness and accuracy in credit reporting. We are to construe deductions narrowly, and we are not bound to construe ambiguities in favor of the taxpayer where a deduction is at issue. *See supra* Part II.A.

"It is not for a court to stretch a statute to cover something not covered. A court should not strain either way. It must seek the plain natural meaning as best it can." *Wentz v. United States*, 244 F.2d 172, 175 (9th Cir. 1957). We hold that petitioners' FCRA actions did not involve claims of unlawful discrimination as defined in section 62(e)(18)(i) because those claims did not involve provisions of federal law providing for the enforcement of civil rights. The portion of the litigation settlement proceeds consisting of attorney's fees and costs at issue is includible in petitioners' gross income, and that same portion is not deductible under section 62(a)(20).

We have considered the arguments made by the parties, and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*An appropriate order and decision will be entered.*